IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 04-269-16 |
| | : | |
| DEREK RUSSELL | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                     **December 20, 2024**

The United States Bureau of Prisons mistakenly believed convicted drug dealer Derek Russell obtained his GED when it transferred him out of a correctional facility to a residential reentry facility seven months ago. He continued his commendable efforts at rehabilitation in the residential reentry facility under continuing extensive restrictions on his liberty. The Bureau realized its mistake four months later. It transferred him back to a correctional facility without a hearing. His present facility faces repeated lockdowns while he awaits release from an amended 305 month sentence.

Mr. Russell moves for compassionate release arguing the abrupt removal from the residential reentry facility without a hearing, his demonstrated rehabilitation, and conditions of confinement in his present facility are extraordinary and compelling reasons for release. We appreciate Mr. Russell's disappointment. He had a taste of life outside of a full correctional facility after twenty years' incarceration. But we cannot find the Bureau's returning him to a facility from a restrictive residential reentry program, his commendable rehabilitation, and the conditions of his present facility warrant compassionate release. We deny his motion for compassionate release.

I. **Facts**

A jury convicted Derek Russell of conspiring to manufacture and distribute more than five kilograms of cocaine and more than fifty grams of a substance containing crack cocaine in 2005.[1] Judge McLaughlin sentenced Mr. Russell in 2006 to life under a since-amended version of the Controlled Substances Act through which Congress then mandated a life sentence because two earlier courts convicted Mr. Russell for other "felony drug offenses."[2]

Congress later made two relevant changes to section 841(b). First, Congress through the Fair Sentencing Act in 2010 increased the amount of crack cocaine required to trigger the mandatory penalties which had applied to Mr. Russell.[3] Second, Congress through the First Step Act in 2018 made the crack-cocaine-related changes retroactive.[4]

*Mr. Russell's earlier requests for reduced sentences.*

Mr. Russell moved in 2019 for a reduced sentence under Section 404 of the First Step Act, arguing Congress's amendments to section 841 warranted a reduced sentence.[5] We denied his motion.[6] We found Congress's retroactive changes to the Controlled Substances Act applied to Mr. Russell's crack-related sentence.[7] But we did not resentence Mr. Russell because the jury also convicted him of conspiring with intent to distribute more than five kilograms of powder cocaine and Congress did not retroactively change the powder cocaine-related sentencing laws through the Fair Sentencing Act or First Step Act.[8]

Mr. Russell moved for compassionate release in 2022 and argued changes in circuit law constituted extraordinary and compelling reasons for his early release.[9] We denied Mr. Russell's motion.[10] Mr. Russell moved for reconsideration and the United States responded and agreed Mr. Russell was eligible for a reduced sentence in light of recently-changed caselaw.[11] Mr. Russell then filed a counseled motion to reduce his sentence under to Section 404 of the First Step Act in

December 2022 and filed supplemental briefing in April 2023.[12] We entered an amended judgment on April 28, 2023 sentencing Mr. Russell to 305 months' imprisonment.[13]

Mr. Russell moved pro se numerous times thereafter requesting we reconsider our reduced sentence or credit him for time served.[14] We denied those motions finding we fully considered Mr. Russell's present family circumstances when we reduced his sentence after an extensive resentencing hearing where Mr. Russell had the benefit of counseled representation.[15]

### *The Bureau of Prisons transferred Mr. Russell to a halfway house six months ago and then returned him a correctional facility four months ago.*

The Bureau of Prisons transferred Mr. Russell to a Kintock residential reentry facility—or "halfway house"—on May 15, 2024 after twenty years in a correctional facility.[16] The Bureau of Prisons maintained custody through the Kintock facility.[17] He attended weekly therapy there, performed cleaning duties to earn outside passes, spent time with family, worked construction, and found additional future work.[18] The Kintock facility leadership requires head counts multiple times a day, has a curfew, forbids alcohol or drug use, and keeps track of the residents' whereabouts with permission and monitoring when they leave the facility.[19]

But then the Bureau of Prisons removed Mr. Russell on September 18, 2024 from Kintock without explanation. The Bureau later explained it transferred Mr. Russell back to a correctional facility because "the RRM office had erroneously awarded Mr. Russell FSA credits based on having a GED, which he has not yet obtained."[20] The United States has housed Mr. Russell at FCI Hazelton correctional facility for the past approximately four months, where he has experienced repeated lockdown status.[21]

The Federal Bureau of Prisons calculates Mr. Russell's release date as July 2, 2026.[22]

**II.    Analysis**

Mr. Russell moves for compassionate release citing Congress's grant under 18 U.S.C. section 3582(c)(1)(A)(i).[23] Mr. Russell argues his situation is rare and egregious, the Bureau of Prisons violated his due process rights, his rehabilitation and his successful reentry into the community favor his release, and the "abhorrent conditions" at FCI Hazelton together constitute extraordinary and compelling reasons to reduce his custodial sentence to time served and release him to supervision. The United States timely countered Mr. Russell does not meet extraordinary and compelling reasons for relief and the sentencing factors weigh against release.[24] We agree with the United States because Mr. Russell does not meet extraordinary and compelling reasons for release.

Congress allows us to grant compassionate release if Mr. Russell: (1) shows "extraordinary and compelling reasons warrant" a reduction; and (2) shows "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[25] Our Court of Appeals instructs policy statements are "not binding," but "shed[] light on the meaning of extraordinary and compelling reasons."[26] We also must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable" and find Mr. Russell is not a danger to the community.[27] Mr. Russell "bears the burden of proving that extraordinary and compelling reasons exist."[28]

**A. Mr. Russell does not show extraordinary and compelling reasons warrant a reduction in his sentence.**

Mr. Russell cites four reasons for early release: (1) the situation is rare and egregious, (2) the Bureau of Prisons violated his due process rights in returning him to a correctional facility after placement in a halfway house, (3) his rehabilitation and his successful reentry into the community favor his release, and (4) the "abhorrent conditions" at FCI Hazelton favor his release.[29] The United States counters Mr. Russell does not meet extraordinary and compelling reasons for relief because

4

early release with custodial credit for his time in the halfway house does not violate Mr. Russell's rights, Mr. Russell's due process rights are not implicated because he received credit for time served, rehabilitation is not a basis for release, and general prison conditions are the same for all incarcerated persons and do not alone form a basis for compassionate release.[30] We agree with the United States.

As one court of appeals summarized, the "'extraordinary and compelling' circumstances contemplated by Congress and the Sentencing Commission have traditionally focused on circumstances personal to the defendant or his family. . . . [a]nd that remains generally true under the revised policy statement. The first four enumerated circumstances ask: Is the defendant exceptionally sick, elderly, indispensable for family care, or was he the victim of abuse while in custody? . . . The catch-all category then makes room for 'other circumstance[s]' 'similar in gravity' to these."[31]

### 1. Mr. Russell's unfortunate transfers are not so rare and egregious as constituting extraordinary and compelling circumstances.

Mr. Russell first argues his transfer out of a halfway house where he showed growth and placement in a facility with lockdown is so rare and egregious it constitutes extraordinary and compelling circumstances. He does not offer, and we are not aware of, cases considering a motion for compassionate release brought because the United States erroneously transferred an incarcerated person to a halfway house and then transferred him back to a correctional facility before the end of his custodial sentence. We do, however, have the benefit of our Court of Appeals's analysis seventeen years ago in *Vega v. United States*.[32] Our Court of Appeals considered a habeas petition, not a motion for compassionate release, but its analysis is instructive. Mr. Vega petitioned for habeas relief under 28 U.S.C. section 2241 requesting time served credit for a two year period "during which he was at liberty after being erroneously released from

confinement by New York prison officials."[33] Judge Gibson denied the petition and Mr. Vega appealed.[34]

Our Court of Appeals directed "[a]s a preliminary matter, . . . the interests upon which we base this test do not have constitutional stature" because they were "unable to conclude that credit for time spent at liberty is among those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'" [35] Our Court of Appeals surveyed the law of other circuits and concluded other courts likewise declined to find due process violations in similar circumstances.[36] It found no constitutional basis for the petition. Our Court of Appeals then looked to common law doctrines and identified "three interests . . . of paramount importance when determining whether an erroneously released prisoner should be granted credit for the time he was at liberty": simple fairness to the incarcerated person, not granting "excessive power" to those officers who administer sentences, and "the government's and society's interest in convicted criminals serving out their sentences."[37] The court then offered us a standard: "[I]n order for a prisoner to receive credit for time he was erroneously at liberty, the prisoner's habeas petition must contain facts that demonstrate that he has been released despite having unserved time remaining on his sentence. Once he has done this, the burden shifts to the government to prove either (1) that there was no negligence on the part of the imprisoning sovereign, or (2) that the prisoner obtained or retained his liberty through his own efforts."[38]

Our Court of Appeals "remand[ed] for further consideration in accordance with this opinion of whether [Mr.] Vega should receive credit for the time he spent at liberty."[39] But the Court of Appeals's analysis considered only whether Mr. Vega might receive credit for time at liberty against his custodial sentence.[40] The Court of Appeals directed "a mistaken release does not prevent a government from reincarcerating a prisoner who has time to serve."[41]

Our Court of Appeals in *Vega* reached two conclusions material to us today: (1) returning an erroneously released incarcerated person to prison is not a constitutional violation without more, and (2) erroneous releases happen, Our Court of Appeals in *Vega* found plenty of examples of courts considering whether to credit erroneously released incarcerated persons time served for their periods of release.[42] And we note the court in *Vega* dealt with a defendant mistakenly released from any form of custody compared to the Bureau of Prisons's decision transfer Mr. Russell to a lesser form of confinement in a halfway house.

Mr. Russell asks we consider the Court of Appeals for the Ninth Circuit's guidance in reviewing a habeas petition in *Johnson v. Williford* where the court held the Bureau of Prisons was equitably estopped from revoking parole and returning the offender to prison violated his due process rights.[43] But this guidance concerned revoking parole without a hearing and for insufficient cause. And although Mr. Johnson had been released on parole too early, the court of appeals found compelling "[t]he record discloses at least eight separate administrative reviews of [Mr.] Johnson's projected parole date. Each review confirmed that [Mr.] Johnson could be paroled. His expectation of release on parole on September 18, 1980, was raised almost as soon as he began to serve his sentence, and was encouraged and heightened by the successive administrative reviews."[44] We are presented with much different facts. The Bureau of Prisons mistakenly released Mr. Russell to a halfway house thinking he obtained his GED and the Bureau of Prisons recognized he did not and their resulting mistake four months later.

Mr. Russell also cites to *United States v. Davis*, where Judge Young found extraordinary and compelling circumstances for release.[45] Judge Young found important, in the context of revocation of home confinement for cause, "Mr. Davis's reincarceration for a cracked phone that apparently occurred without a revocation hearing, his serious medical conditions, his age, and his

7

stellar record in prison, where [he] received his GED and participated in other educational courses and programs, * * * and his success on home confinement."[46] But, unlike today, the Bureau of Prisons in *Davis* had intentionally and rightly released Mr. Davis to home confinement, Mr. Davis had been released to home confinement for years, the Bureau of Prisons revoked Mr. Davis's home confinement for cause (for a cracked phone) but without a hearing, and Mr. Davis had serious health issues more easily dealt with in home confinement. In contrast, Mr. Russell was released to a halfway house for four months unintentionally, his transfer back to prison was not for cause but to rectify an earlier mistake, and Mr. Russell does not suffer from health issues which weigh in favor of his release to home confinement. The other cases relied upon by Mr. Russell on this point are similarly distinguishable.[47]

Mr. Russell then argues courts consider absurdities caused by bureaucracy to be "extraordinary and compelling" circumstances supporting compassionate release.[48] But the cases he cites dealt with bureaucratic issues which led to a longer or delayed sentence for the incarcerated person.[49] Mr. Russell is receiving credit towards his custodial sentence for the full four months he erroneously spent in the halfway house.[50] He is not serving a longer sentence due to the Bureau's mistake corrected four months later.

Mr. Russell then argues, still in support of his position the present situation is rare and egregious, he has exhibited rehabilitation through his good conduct in prison and successful community reentry in the halfway house.[51] Rehabilitation alone is not a basis for compassionate release.[52] We recognize rehabilitation can be considered in the extraordinary and compelling analysis in combination with other circumstances.[53] But the cases cited by Mr. Russell concern incarcerated persons rightly released based on a modification of their sentence and then compelled to resume their custodial sentence when a court later vacated their amended judgments.[54] In other

8

words, the cases cited by Mr. Russell addressed (1) challenges to an incarcerated person's armed career criminal status (2) which would return them to prison after years of supervised release, where (3) the movant was not in custody.[55] Years of successful community reentry post-release after a sentence reduction which is later overturned might constitute extraordinary and compelling circumstances in some cases, but this is not such a case.

### 2. The Bureau's return of Mr. Russell from the halfway house to the facility did not violate due process.

Mr. Russell argues the Bureau of Prisons never provided him "with formal notice or an explanation for its decision, and the [Bureau of Prisons] has not given him an opportunity to address whatever concerns led to his incarceration. Because Mr. Russell had a vested liberty interest in his halfway house placement, he should have been afforded due process protections before being rearrested."[56] But Mr. Russell cites cases considering due process in the parole system or home confinement system based on violations of conditions of release.[57] The judges in those cases generally found the termination of a parolee's liberty interest requires some "effective but informal hearing."[58] But we are not considering the revocation of earned parole for cause. And our Court of Appeals confirmed release to a halfway house is afforded less due process protections than release on parole. Our Court of Appeals in *Asquith v. Department of Corrections* considered Mr. Asquith's civil rights challenge after he returned to his halfway house inebriated and the New Jersey Department of Corrections returned him to prison.[59] Mr. Asquith argued the state "denied due process of law when the [New Jersey Department of Corrections] failed to return him to the halfway house without first providing a hearing."[60] Judge Irenas granted the state's motion for summary judgment and Mr. Asquith appealed.[61] Our Court of Appeals began with the premise "a prisoner does not have a liberty interest in remaining in a preferred facility within a state's prison system."[62] The court then analyzed the difference in liberty interests between a halfway house and

a pre-parole program and ultimately held, unlike a pre-parole program, Mr. Asquith "never left institutional confinement."[63] Our Court of Appeals cited persuasive facts such as a strictly monitored halfway house with curfew, needing to "stand count" several times a day, and alcohol and drug monitoring. These facts led the court to find "[t]hese restrictions are dispositive because they amount to institutional confinement."[64] Our Court of Appeals then reiterated "[t]he Supreme Court has consistently held that while a prisoner remains in institutional confinement, the Due Process Clause does not protect his interest in remaining in a particular facility" and therefore his "removal from the halfway house did not trigger the protections of the Due Process Clause."[65]

Our Court of Appeals in *Vega* also reminded us the Bureau does not violate an incarcerated person's due process rights where "a prisoner who has been erroneously released and has begun the rehabilitation process" must "return to incarceration."[66]

Like Mr. Asquith, correctional officials transferred Mr. Russell to a halfway house. Mr. Russell could visit with family and seek employment, but Mr. Russell remained in institutional confinement and the Bureau of Prisons maintained custody through the Kintock facility.[67] The facility prohibited his use of drugs or alcohol.[68] The facility required head counts multiple times a day, had a curfew, and kept track of Mr. Russell's whereabouts with required permission and monitoring whenever he left the facility.[69] And, in line with our Court of Appeals's guidance in *Vega*, Mr. Russell will receive full credit towards his custodial sentence for the four months he spent in the halfway house.

> **3. Mr. Russell's commendable rehabilitation both in the correctional facility and halfway house is not alone an extraordinary and compelling reason for release.**

Mr. Russell argues rehabilitation through his good conduct both in the correctional facility and in the halfway house warrants compassionate release.[70] And while rehabilitation alone is not

10

a basis for compassionate release, rehabilitation can be considered in the extraordinary and compelling analysis in combination with other circumstances.[71]

We find no basis on the adduced facts to conclude extraordinary and compelling reasons require his release. We do not find Mr. Russell's demonstrated rehabilitation pushes the totality of the circumstances into the realm of the extraordinary.

### 4. Conditions at FCI Hazelton do not warrant compassionate release.

Mr. Russell argues compassionate release is warranted because there are "dire circumstances" at his present custodial facility FCI Hazelton.[72] Mr. Russell highlights reports of dangerousness, staff shortages, abuse, and the facility's inability to provide appropriate medical care for its incarcerated population.[73] The alleged and reported conditions are unfortunate. But Mr. Russell does not present a complaint unique to him and "generic hardships, common to federal prisoners, cannot be regarded as extraordinary, and have not furnished grounds for compassionate release."[74]

### B. We do not consider the sentencing factors or whether Mr. Russell is a danger to the community.

Mr. Russell does not present an extraordinary and compelling reason for his release. Absent this threshold finding we need not analyze whether he is a danger to the community or if early release would be consistent with Congress's section 3553(a) factors.

## III. Conclusion

We deny Mr. Russell's Motion for compassionate release. We cannot find extraordinary and compelling circumstances. We appreciate the Bureau's mistake in Mr. Russell's GED status leading to a transfer to Kintock and back to a correctional facility four months later is regrettable. We understand Mr. Russell's disappointment. We commend his rehabilitation aware of his need to reenter our community as presently scheduled for early July 2026. But the mistake and

11

rehabilitation are not extraordinary and compelling reasons for compassionate release. The Bureau maintained substantial restrictions on Mr. Russell in the Kintock halfway house. The Bureau did not release him from custody. Mr. Russell's present conditions in his facility do not warrant release. Mr. Russell will receive full credit for his time in the halfway house towards his custodial sentence. We find no fact basis to set aside the United States' and society's interest in enforcing considered sentences.

---

[1] ECF 1218 at 28 (*United States v. Willis*, 417 F. Supp. 3d 569, 592 (E.D. Pa. 2019), *vacated and remanded on other grounds by consent*, No. 19-3249, 2020 WL 5901553 (3d Cir. July 21, 2020)).

[2] *Willis*, 417 F. Supp. 3d at 592; 21 U.S.C. § 841(b)(1)(A) (effective March 9, 2006 through July 26, 2006 (Pub. L. 109-177, Title VII, § 711(f)(1)(B), Pub. L. 109-248, Title II, § 201)).

[3] Fair Sentencing Act of 2010, Pub. L. No. 111-220 § 2(a)(1), 124 Stat. 2372, 2372 (changing the amount of crack cocaine required to trigger certain mandatory minimums from fifty grams to 280 grams); *see also Willis*, 417 F. Supp. 3d at 573.

[4] First Step Act of 2018, Pub. L. No. 115-391 § 404(b), 132 Stat. 5194, 5222; *see also Willis*, 417 F. Supp. 3d at 573.

[5] *See* ECFs 1191, 1198, 1204, 1205. Congress through section 404 of the First Step Act allows defendants to move for a reduced sentence if the laws made retroactive through the First Step Act modified penalties applied to the defendant. *See* First Step Act of 2018, Pub. L. No. 115-391 § 404(b), 132 Stat 5194, 5222.

[6] *Willis*, 417 F. Supp. 3d at 592–93.

[7] *Id.*

[8] *Id.* at 593.

[9] ECF 1243.

[10] ECFs 1244, 1255.

[11] ECFs 1254, 1257.

[12] ECFs 1262, 1271.

[13] ECFs 1273, 1274.

[14] ECFs 1275, 1281, 1283, 1285.

[15] ECFs 1280, 1282, 1284, 1286.

[16] ECF 1287 at 2.

[17] ECF 1289 at 10.

[18] ECF 1287 at 17–18.

[19] The Kintock Group, *State Reentrant Handbook*, 12–15, (Feb. 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/offices-and-bureaus/bcc/handbooks/region-1/Kintock%20Erie%20Handbook.pdf.

[20] ECF 1287 at 2 n.1.

[21] *Id.* at 2.

[22] *Id.*

[23] *See generally id.*

[24] ECF 1289. We mistakenly set the United States' response date for a Saturday. ECF 1288. We apologize to counsel for misreading the December 2024 calendar.

[25] 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021) ("[A] a prisoner's motion may be granted if the court finds that the sentence reduction is (1) warranted by 'extraordinary and compelling reasons'; (2) 'consistent with applicable policy statements issued by the Sentencing Commission'; and (3) supported by the traditional sentencing factors under 18 U.S.C. § 3553(a), to the extent they are applicable.") (further citation omitted).

[26] *Andrews*, 12 F.4th at 259–60.

[27] 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13(a)(2) (citing 18 U.S.C. § 3142(g)).

[28] *United States v. Smith*, No. 09-187, 2020 WL 4047485, at *2 (W.D. Pa. July 20, 2020). The parties agree Congress's section 3582(c)(1)(A)(i) exhaustion requirement is not a bar to considering Mr. Russell's Motion. ECF 1287 5–6; ECF 1289 4–5 n.2.

[29] ECF 1287.

[30] ECF 1289.

[31] *United States v. Washington*, 122 F.4th 264, 267 (6th Cir. 2024) (citations omitted).

[32] 493 F.3d 310 (3d Cir. 2007).

[33] *Id.* at 313.

[34] *Id.*

[35] *Id.* at 316–17 (first citing *Dunne v. Keohane*, 14 F.3d 335, 335–36 (7th Cir. 1994), then quoting *Powell v. Alabama*, 287 U.S. 45, 67 (1932)).

[36] *Id.* at 317.

[37] *Id.* at 318.

[38] *Id.* at 319.

[39] *Id.* at 313.

[40] *Id.* at 317–22.

[41] *Id.* at 316.

[42] *See generally id.*

[43] 682 F.2d 868 (9th Cir. 1982).

[44] *Id.* at 872.

[45] *United States v. Davis*, No. 2-2, ECF 203 (S.D. Ind. Dec. 22, 2023).

[46] *Id.* at 3–4.

[47] *See, e.g.*, *United States v. Florence*, No. 18-185, ECF 52 (E.D. Va. Apr. 15, 2022) (defendant had been wrongfully returned to prison for failing to register a legal prescription for suboxone with the Bureau of Prisons); *United States v. Levi*, No. 4-235-29, ECF 2085 (D. Md. July 6, 2021) (where a release to home confinement cured medical concerns raised by elderly incarcerated person, resumption of custodial sentence for parole violation was improper).

[48] ECF 1287 at 10 (citing *United States v. Comer*, No. 12-43, 2022 WL 1719404, at *5 (W.D. Va. May 27, 2022); *United States v. Burr*, No. 16-4081, 2022 WL 989225, at *4 (W.D. Mo. Mar. 31, 2022); *United States v. Patterson*, No.15-74-4, 2022 WL 807783, at *1 (E.D. Wis. Mar. 17, 2022)).

[49] *See, e.g.*¸ *United States v. Comer*, No. 12-43, 2022 WL 1719404, at *2 (W.D. Va. May 27, 2022) (granting compassionate release where, "in direct contravention of the court's intent, Comer's federal sentence is being run consecutive to, instead of concurrent to, his 6.5-year state sentence"); *United States v. Burr*, No. 16-4081, 2022 WL 989225, at *2 (W.D. Mo. Mar. 31, 2022) ("The Court finds that reducing Defendant's sentence from a 120-month term of imprisonment to a 99-month term of imprisonment to account for the time Defendant spent in federal custody from January 2017 through October 2018 is warranted under (1) Federal Rule of Criminal Procedure 36, and (2) 18 U.S.C. § 3582(c)."); *United States v. Patterson*, No. 15-74-4, 2022 WL 807783, at *1 (E.D. Wis. Mar. 17, 2022) ("For six years, Jerrod Patterson . . . sat in federal custody with a state detainer hanging over him. He has been ineligible for federal programming because of the detainer, and, despite this Court ordering that his federal sentence run concurrent to his state sentence, he faces an additional 32-month state sentence upon being released from federal custody.

. . . [T]he Court will provide relief to Patterson by granting him compassionate release and reinstituting the goals of this Court's original sentence.").

[50] ECF 1289 at 9.

[51] ECF 1287 at 10–12 (citing cases where defendants demonstrated successful reintegration in the community but faced returning to prison after their amended judgments, following successful challenges to their armed career criminal status, were overturned on appeal).

[52] 28 U.S.C. § 994(t).

[53] *United States v. Carter*, 711 F. Supp. 3d 428, 441 (E.D. Pa. 2024).

[54] ECF 1287 at 10–12.

[55] *See, e.g.*, *United States v. Morris*, No. 9-142-3, ECF 283 at 1 (E.D. Tenn. Sept. 27, 2022) ("After four and a half years on supervised release, he faces a return to prison, not because of a revocation or new crime, but due to a reversal of the law governing his qualification as an armed career criminal.").

[56] ECF 1287 at 12 (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)).

[57] *Id.* at 12–15.

[58] *See, e.g.*, *Morrissey*, 408 U.S. at 485.

[59] *Asquith v. Dep't of Corr.*, 186 F.3d 407, 409 (3d Cir. 1999).

[60] *Id.*

[61] *Id.*

[62] *Id.* at 410 (citing *Montanye v. Haymes*, 427 U.S. 236, 242 (1976); *Meachum v. Fano*, 427 U.S. 215, 224–25 (1976)).

[63] *Id.* at 410–11 (discussing 520 U.S. 143 (1997)).

[64] *Id.* at 411.

[65] *Id.* (citations omitted); *see also Haley v. Kintock Grp.*, 587 F. App'x 1, 3 (3d Cir. 2014), *as amended* (Oct. 7, 2014) (quoting *Asquith*, 186 F.3d at 411) ("Moreover, in *Asquith v. Department of Corrections*, * * * we held that placement in a halfway house amounts to 'institutional confinement' when significant restrictions are placed on the freedom of its residents, and that removal from such a halfway house therefore does 'not trigger the protections of the Due Process Clause.'").

[66] *Vega*, 493 F.3d at 317.

[67] ECF 1289 at 10.

---

[68] ECF 1287 at 17–18.

[69] The Kintock Group, *State Reentrant Handbook*, 12–15, (Feb. 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/offices-and-bureaus/bcc/handbooks/region-1/Kintock%20Erie%20Handbook.pdf.

[70] ECF 1287 at 15–18.

[71] 28 U.S.C. § 994(t); *Carter*, 711 F. Supp. 3d at 441.

[72] ECF 1287 at 18–19.

[73] *Id.*

[74] *United States v. Lorenzo*, No. 19-744, 2023 WL 1818370, at *2 (D.N.J. Feb. 7, 2023) (first citing *United States v. Bulaman*, 12-794, 2022 WL 3913430, at *4 (D.N.J. Aug. 31, 2022), then citing *United States v. Canzater*, No. 18-578, 2022 WL 1602163, at *10 (D.N.J. May 20, 2022); finally citing *United States v. Burney*, 18-606, 2021 WL 4963253, at *8 (D.N.J. Oct. 25, 2021)).